[No. A092551. First Dist., Div. Four. Mar. 28, 2003.]

BERNIE CHAVERS et al., Plaintiffs and Appellants, v.
GATKE CORPORATION, Defendant and Respondent.

## COUNSEL

Brayton, Purcell, Curtis & Geagan and Gilbert Purcell for Plaintiffs and Appellants.

Sedgwick, Detert, Moran & Arnold, Frederick D. Baker, Paul J. Riehle, Kirk C. Jenkins and Charles P. Murrin for Defendant and Respondent.

## OPINION

**SEPULVEDA, J.**—This appeal requires us to consider the vitality of the idea of "group" or "collective" legal accountability in the products liability

context. For well over a quarter century, courts across the nation have struggled with a variety of novel theories under which manufacturers of a defective product could assertedly be held liable in damages to plaintiffs injured by use of or exposure to it. Litigation involving asbestos, tobacco, and DES are prominent examples. Owing to circumstances, the plaintiffs in such cases often were unable to identify the *specific* manufacturer of the product that allegedly produced *their* injuries. The rule at common law, of course, placed tort litigants under an unwaivable requirement of proving not only a compensable injury but also the identity of the offending manufacturer whose acts *caused* the plaintiff's injury. Proof of causation, in other words, is an essential condition for liability in tort.

In the struggle to adjust traditional notions of tort liability to the changing realities of national business practices, five more or less distinct theories have arisen. Under all of them, product manufacturers can be held collectively—and jointly and severally—liable in tort without proof of "causation" as conventionally understood in tort law. These doctrines, going under such names as "alternative liability," "industry-wide (or 'enterprise') liability," "market share liability," "concert of action" and "conspiracy," have received a mixed reception in American courts. We consider here whether respondent, formerly a manufacturer of friction brake products containing asbestos, can be held liable in tort to plaintiffs husband and wife for injuries caused by asbestos inhalation where, plaintiffs conceded, they possessed no evidence husband had been exposed to products manufactured by defendant. Plaintiffs contend defendant manufacturer was liable to them in strict liability and for negligence on theories of civil conspiracy and concert of action, and that the trial court erred when it refused to instruct the jury on those issues. Having concluded both instructions proffered by plaintiffs were inappropriate as a matter of law and that the trial court thus did not err in declining to give them, we will affirm.

## FACTUAL BACKGROUND

With his wife Mary as coplaintiff, Bernie Chavers, who worked for several years as an automobile and truck mechanic repairing friction brakes, filed a complaint for damages for injuries allegedly caused by prolonged inhalation of asbestos-laden particles.[1] Brake work of the type Chavers performed required that brake shoes—composed in part of asbestos because it resists the extreme heat generated by stopping a multi-ton vehicle—be sanded with high-speed machines, a process that gives off dust particles which, unless the operator wears a mask or other appropriate protection, are

---

[1] The trial record also indicates Mr. Chavers worked around asbestos and was thus exposed to it while serving in the United States Navy from 1958 to 1962.

inhaled into the lungs. The theory underlying plaintiffs' complaint was that while working around automotive brakes, Mr. Chavers contracted a form of pulmonary cancer—mesothelioma—caused by the inhalation of asbestos particles. The Chaverses' complaint joined as defendants scores of manufacturers, suppliers, and distributors of friction brake products containing asbestos—59 named defendants and 800 "Doe" defendants—asserting, in the fourteenth cause of action, that all were jointly and severally liable for plaintiffs' injuries under two theories of group liability. Prior to trial, plaintiffs reached settlement agreements with all but two of the defendants—respondent Gatke Corporation (Gatke), a dissolved, bankrupt company that had in the past manufactured automotive brakes and clutches, and Owens-Illinois, Inc.

A jury trial of the Chaverses' tort claims against these two remaining defendants began in January 2000. Before trial commenced, plaintiffs conceded they possessed no evidence establishing that Bernie Chavers had used or worked around brake shoes manufactured by Gatke, that is, plaintiffs admitted they were unable to prove that Gatke-manufactured brake shoes had "caused" Mr. Chavers' injuries. In a liability wrinkle that has produced this appeal, however, the Chaverses' attorneys contended Gatke could be held liable in tort without proof that its friction products played any role in the causal chain that led to Mr. Chavers' illness. Specifically, during the course of the trial, plaintiffs presented testimony from an expert witness, David Egilman, M.D., that beginning around 1936 a number of manufacturers whose products contained asbestos had contributed financing to the Saranac Laboratory, a private research facility at Saranac Lake, New York, for the purpose of investigating the health effects of asbestos on those who used or worked around it. According to plaintiffs' theory of Gatke's tort liability, purportedly supported by Dr. Egilman's trial testimony, a decade passed before the director of the Saranac Laboratory reported to those financing the investigation that findings made by the researchers pointed to asbestos as having seriously harmful effects on the health of those exposed to it, including cancer.

At the behest of some of the members of the consortium funding the Saranac Laboratory research, plaintiffs contended through Dr. Egilman's testimony, all references to cancer were deleted from the report before it was released for publication. Only years later did the public learn what those who financed the Saranac Laboratory research had long known—asbestos can cause serious, even fatal, harm to those exposed to it. To complete the description of plaintiffs' theory of group tort liability, they asserted the suppression of the adverse Saranac Laboratory findings by those manufacturers responsible for funding the research amounted to a tortious failure to

warn potential users of asbestos-laden products of their adverse health effects. As a result, thousands of Americans continued to use and work around asbestos for decades to come, unaware of what Gatke and other manufacturers who had supported the Saranac Laboratory research already knew—that exposure to asbestos can cause cancer.

At the instructions conference before the trial judge, plaintiffs' counsel requested the court include in its charge to the jury special instructions embodying two of the theories of group tort liability—civil conspiracy and concert of action. Following considerable discussion between the trial judge and counsel for the parties, the court refused to include plaintiffs' special instructions in its charge to the jury. After retiring and deliberating, the jury returned with a verdict in favor of defendant. Specifically, the jury answered "no" to the following questions on the special verdict form: "Was there in existence at any time [a] conspiracy involving defendant Gatke Corporation committing concealment or intentional misrepresentation as defined in these instructions?" and "Were Gatke Corporation and Owens-Illinois, Inc. in the same conspiracy?"

This timely appeal by plaintiffs from a final judgment in favor of Gatke followed.

ANALYSIS

1. *The trial court did not err in declining to give the jury a civil conspiracy instruction on plaintiffs' negligence and strict liability tort claims.*

 As noted, plaintiffs asked the trial court to read to the jury instructions offered by them permitting a finding of tort liability for negligence or strict liability based on a theory of civil conspiracy. Following discussion with counsel, Judge James J. McBride refused to give the instruction proffered by plaintiffs, giving instead a conspiracy instruction involving concealment and intentional misrepresentation. Plaintiffs contend the trial court's instructional omission constituted reversible error.

Resolution of this issue, we decide, is straightforward. The following statement appears in our high court's *Applied Equipment* opinion (*Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 514 [28 Cal.Rptr.2d 475, 869 P.2d 454] (*Applied Equipment*)): "Conspiracy is not an independent tort; it cannot create a duty or abrogate an immunity. It allows tort recovery only against a party who already owes the duty and is not immune from liability based on applicable substantive tort law principles. [Citations.]" The unstated premise for this conclusion, or perhaps a

consequence of it, is that an allegation of conspiracy itself does not lay a predicate for substantive civil liability. The Supreme Court's *Applied Equipment* opinion plainly holds that before one can be held liable for civil conspiracy, he must be capable of being *individually liable for the underlying wrong as a matter of substantive tort law*. And that requirement, of course, means he must have owed a legal duty of care to the plaintiff, one that was breached to the latter's injury.

In seeking to fix the operative implications of the *Applied Equipment* holding, it is helpful to go back in time to see what provoked it. That was Justice Sullivan's opinion for the Court of Appeal in *Wise v. Southern Pacific Co.* (1963) 223 Cal.App.2d 50 [35 Cal.Rptr. 652] (*Wise*). In that case, the court held that one party to a contract could, through use of a civil conspiracy theory, be held liable in tort for interference with contract as a result of the acts of another, a coconspirator and a stranger to the contract. The *Wise* court termed such a liability outcome consistent with "the principle that all who are involved in a common scheme are jointly and severally responsible for the ensuing wrong" and also "consonant with good morals." (*Id.* at pp. 71-72.)

As a matter of unqualified logic, it is not difficult to see how the *Wise* court reached its conclusion. It is the essence of common law conspiracy doctrine that the coconspirators are liable in the same way and to the same extent as the principal who actually commits the harmful or outlawed act. The agreement of all and the overt act of one is sufficient to impose the same liability on all for the act of the one. (See, e.g., *Mox Incorporated v. Woods* (1927) 202 Cal. 675, 677-678 [262 P. 302] ["the major significance of the conspiracy lies in the fact that it renders each participant in the wrongful act responsible as a joint tortfeasor for all damages ensuing from the wrong, irrespective of whether or not he was a direct actor and regardless of the degree of his activity"].)

The erosion of the analysis and result in *Wise, supra*, 223 Cal.App.2d 50—which had been followed in a number of published Court of Appeal decisions (see *Applied Equipment, supra*, 7 Cal.4th at p. 510)—began with the Supreme Court's opinion in *Gruenberg v. Aetna Ins. Co.* (1973) 9 Cal.3d 566 [108 Cal.Rptr. 480, 510 P.2d 1032] (*Gruenberg*) a decade later. There, it was alleged the three defendants—an insurance adjuster, an attorney, and the plaintiff's insurer—conspired to breach the implied contractual covenant of good faith and fair dealing by tortiously fomenting false criminal charges against the plaintiff-insured in order to evade liability under a fire insurance policy. (*Id.* at pp. 570-572.) Relying in part on the established "agent's immunity rule," the *Gruenberg* court declined to impose tort liability on the

defendants. In addition to the agent's immunity rule, however, the *Gruenberg* court invoked a second principle—that "the non-insurer defendants were not parties to the agreements for insurance; therefore, they are not, as such, subject to an implied duty of good faith and fair dealing." (*Id.* at p. 576.)

The limitation on conspiracy liability announced by the court in *Gruenberg* was endorsed and its rationale explicated somewhat by the Supreme Court in *Doctors' Co. v. Superior Court* (1989) 49 Cal.3d 39 [260 Cal.Rptr. 183, 775 P.2d 508] (*Doctors' Co.*). There, a third party claimant, proceeding under the procedure approved in *Royal Globe Ins. Co. v. Superior Court* (1979) 23 Cal.3d 880 [153 Cal.Rptr. 842, 592 P.2d 329], filed suit in tort against an insurer, its attorney, and an expert witness, contending the three had conspired to violate an Insurance Code statute making it an unfair business practice for an insurer to refrain from effecting a prompt and fair settlement of pending claims. (*Doctors' Co., supra,* at pp. 42-43.) The trial court overruled a demurrer to the conspiracy count; the defendants sought writ relief; the Supreme Court vacated the order overruling the demurrer. Writing for a unanimous court, Justice Kaufman's opinion made it clear that a member of a civil conspiracy is liable in tort *only* if he was under a legal duty originating in some source *other than the conspiracy itself.* "A cause of action for civil conspiracy may not arise," he wrote, "if the alleged conspirator, though a participant in the agreement underlying the injury, was not *personally bound by the duty* violated by the wrongdoing . . . ." (*Id.* at p. 44, italics added.)

The *Gruenberg-Doctors' Co.* line of authority may have reached a zenith of sorts with the high court's opinion in *Applied Equipment, supra,* 7 Cal.4th 503. There, the plaintiff electronics vendor subcontracted with the defendant Litton Saudi Arabia to procure spare electronics parts—including custom-made electron tubes manufactured by defendant Varian Associates—for a military communications and control system Litton was building for the Kingdom of Saudi Arabia. Unhappy with the plaintiff's price markup under the subcontract, Litton unilaterally "renegotiated" its purchase order with the plaintiff, procuring some of the tubes directly from Varian Associates, Inc. (Varian), at a reduced markup. (*Id.* at pp. 508-509.) Applied Equipment then filed suit against Litton and Varian pleading, among other causes of action, the formation of a civil conspiracy by the two companies to tortiously interfere with the contract between the plaintiff and Litton. After a lengthy trial, the jury returned a damages award for the plaintiff on its breach of contract claim against Litton and $2.5 million in damages on the conspiracy-to-interfere-with-contract tort claim against both the defendants. (*Id.* at p. 509.)

Our Supreme Court reversed that judgment. Reviewing the accumulated case law on civil conspiracy, including its own precedents, the court said a plaintiff's invocation of a conspiracy claim "allows tort recovery only against a party who *already owes the duty* and is not immune from liability based on applicable substantive tort law principles. [Citations.] Because a party to a contract owes no tort duty to refrain from interference with its performance, he . . . cannot be bootstrapped into tort liability by the pejorative plea of conspiracy." (*Applied Equipment, supra,* 7 Cal.4th at p. 514, italics added.) The opinion went on to disapprove the contrary holding reached by the Court of Appeal in *Wise, supra,* 223 Cal.App.2d 50, and those cases following it. (*Applied Equipment, supra,* at p. 521, fn. 10.)

 As we read *Applied Equipment* and the antecedent case authorities on which it builds, in California a civil conspiracy to commit tortious acts can, as a matter of law, *only* be formed by parties who are already under a duty to the plaintiff, the breach of which will support a cause of action against them—individually and not as conspirators—in tort. (*Applied Equipment, supra,* 7 Cal.4th at p. 514.) Restated, in cases where the plaintiff alleges the existence of a civil conspiracy among the defendants to commit tortious acts, the source of substantive liability arises out of a preexisting legal duty and its breach; liability can*not* arise out of participation in the conspiracy alone. Moreover, according to these authorities, it makes no difference in the analysis whether the underlying duty is imposed by statute (as in *Doctors' Co.*) or by the common law (as in *Applied Equipment*). A duty, however, independent of the conspiracy itself, must exist in order for substantive liability to attach. That proposition, we conclude, applies in this case and is dispositive of the point. For on this record, it is clear respondent was under no duty to Mr. Chavers for the simple reason that plaintiffs could not show he was exposed to any of *Gatke*'s products.

We recognize the foregoing proposition may be challenged as lacking an impeccable logic but, as was famously written, the "life of the law has not been logic: it has been experience." (Holmes, The Common Law (1881) p. 1.)[2] And we think it is the distillation of experience that has produced the black-letter principle of *Applied Equipment.* Moreover, we are obliged to content ourselves with the law as our Supreme Court has fashioned it.[3] (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr.

[2]That illustrious statement continues: "The felt necessities of the time, the prevalent moral and political theories, intuitions of public policy, avowed or unconscious, even the prejudices which judges share with their fellow-men, have had a good deal more to do than the syllogism in determining the rules by which men should be governed." (Holmes, The Common Law, *supra,* at p. 1.)

[3]In their reply brief, plaintiffs cite and rely on an opinion from the Second District—*Kidron v. Movie Acquisition Corp.* (1995) 40 Cal.App.4th 1571, 1581-1582 [47 Cal.Rptr.2d 752]—for

321, 369 P.2d 937].) That law, as we parse it, includes the principle stated just above. It is for that reason the trial court did not err when it declined to give the jury the civil conspiracy instruction offered by plaintiffs.

2. *On this record, the trial court did not err in refusing to give the jury a concert of action instruction with respect to defendant Gatke.*

 Plaintiffs also contend the trial court erred when, in charging the jury, it declined to give a "concert of action" instruction proffered by them. We think the trial court stood on solid ground in so acting for the reasons given by Justice Mosk in the well-known case of *Sindell v. Abbott Laboratories* (1980) 26 Cal.3d 588 [163 Cal.Rptr. 132, 607 P.2d 924, 2 A.L.R.4th 1061] (*Sindell*). Famous as the decision in which a majority of the California Supreme Court crafted a hybrid group liability theory christened "market share liability," the high court's *Sindell* opinion also *rejected* application of the same concert of action theory of collective liability that plaintiffs sought to fasten on Gatke at trial. In a nutshell, as the *Sindell* opinion described them, the cases in which the concert of action theory of liability has been applied "involve conduct by a small number of individuals whose actions resulted in a tort against a single plaintiff, usually over a short span of time, and the defendant held liable was either a direct participant in the acts which caused damage, or encouraged and assisted the person who directly caused the injuries by participating in a joint activity." (*Id.* at pp. 605-606, fns. omitted.)

In a theory of group tort liability that bears several similarities to plaintiffs' concert of action theory in this case, Judith Sindell alleged that while she was in utero, her mother, along with thousands of other pregnant American women between 1941 and 1971, was given a synthetic compound of the female hormone estrogen known as diethylstilbestrol or DES, as a miscarriage preventative. It was later determined that DES could cause cancerous vaginal and cervical growths in women exposed to it before birth if their mothers took the drug during their pregnancies. The plaintiff in time developed a malignancy of the bladder and related afflictions allegedly caused by her mother's ingestion of DES. Asserting DES was produced from a common and mutually agreed upon formula "as a fungible drug interchangeable with other brands of the same product," and that the drug's manufacturers "collaborated in marketing, promoting and testing the drug,

the proposition that Gatke need only have participated in the antecedent conspiracy to suppress the Saranac Laboratory research results for conspiracy liability to attach. Our reading of the line of Supreme Court case authority culminating in *Applied Equipment, supra,* 7 Cal.4th 503, and the requirement that the defendant must have owed an independent duty of care running to the plaintiff is incompatible with appellants' position. We reject it on that ground.

relied upon each other's tests, and adhered to an industry-wide safety standard," the plaintiff contended the defendant companies were each jointly and severally liable "because they acted in concert, on the basis of express and implied agreements, and in reliance upon and ratification and exploitation of each other's testing and marketing methods." (*Sindell, supra,* 26 Cal.3d at pp. 594-595.)

As indicated, although a majority of the California Supreme Court approved a burden-shifting approach requiring the defendant manufacturers to prove they did not produce the DES the plaintiff's mother had ingested or be liable to the plaintiff in proportion to their shares of the DES market (the so-called "market share" theory), the majority also *rejected* the plaintiff's concert of action theory of liability on the merits in these circumstances. As we explain, we agree with the analysis underlying the *Sindell* court's rejection of a concert of action theory of liability in the comparable circumstances present here.[4]

The theory of group liability that goes under the name "concert of action" traces its origin in part to *Summers v. Tice* (1948) 33 Cal.2d 80 [199 P.2d 1, 5 A.L.R.2d 91], the celebrated case in which the California Supreme Court held that a plaintiff, struck in the eye by birdshot when two hunters each negligently discharged their shotguns in his direction, could recover damages from *both*. Despite the fact that only one of the defendant hunters could have fired the birdshot that struck the plaintiff, both were negligent wrongdoers and it would be unfair, the court reasoned, to deprive the injured plaintiff of a remedy solely because it could not be determined *which* of the negligent defendants had fired the birdshot that actually *struck* the plaintiff. (*Id.* at p. 86.) The concert of action theory of tort liability has also been applied in (and was derived from) the "drag race" and like cases, opinions in which courts held the reciprocal " 'inciting and encouraging one another to drive at a fast and reckless rate of speed' " furnished the necessary "proximate cause" to support joint and several liability of both racers, including the defendant whose car did *not* strike the plaintiff. (*Agovino v. Kunze* (1960) 181 Cal.App.2d 591, 598 [5 Cal.Rptr. 534], quoting *People v. Kemp* (1957) 150 Cal.App.2d 654, 659 [310 P.2d 680]; see also *Loeb v. Kimmerle* (1932)

---

[4]From our review of the trial record, it appears a genuine *Sindell* market share theory of liability was abandoned by plaintiffs (and may have been rejected by the trial court) after the defense argued the brake shoes manufactured by Gatke were not fungible with friction products manufactured by other defendants. (Cf. *Wheeler v. Raybestos-Manhattan* (1992) 8 Cal.App.4th 1152 [11 Cal.Rptr.2d 109] [holding brake products made by five defendants qualified as fungible for *Sindell* purposes because all were produced with chrysotile asbestos, 40 to 60 percent by weight].) No evidence was produced by plaintiffs, defendant argued, that its friction products contained chrysotile and fell within the range of those handful of defendants in the *Wheeler* case.

215 Cal. 143, 151 [9 P.2d 199] [defendant encouraged confederate to assault plaintiff]; *Saisa v. Lilja* (1st Cir 1935) 76 F.2d 380 [drag racing]; *Oliver v. Miles* (1927) 144 Miss. 852 [110 So. 666] [*Summers v. Tice, supra*, 33 Cal.2d 80 scenario]; *Benson v. Ross* (1906) 143 Mich. 452 [106 N.W. 1120] [same].)

The joint liability rules applied in the cases just cited (among others) have been codified in section 876 of the Restatement Second of Torts, titled Persons Acting in Concert. The comment to clause (b) of section 876—the only clause imposing liability on an actor who did not personally cause the harm to the plaintiff[5]—explains that "[a]dvice or encouragement to act operates as a moral support to a tortfeasor and if the act encouraged is known to be tortious it has the same effect upon the liability of the adviser as participation or physical assistance. If the encouragement or assistance is a substantial factor in causing the resulting tort, the one giving it is himself a tortfeasor and is responsible for the consequences of the other's act."[6] (Rest.2d Torts, § 876, com. d, p. 317.) These black-letter rules, and the case authorities upholding them, support the reasons given by the *Sindell* opinion for rejecting a concert of action theory of liability there and, by a parity of reasoning, sustain our rejection of it here. Applying a concert of action theory of collective liability in such industrywide circumstances "would expand the [concert of action] doctrine far beyond its intended scope and would render virtually any manufacturer liable for the defective products of an entire industry, even if it could be demonstrated that the product which caused the injury was not made by the defendant." (*Sindell, supra*, 26 Cal.3d 588 at p. 605.)[7] In light of the thrust of *Sindell* and other group liability precedents we have explored, we decline to hold that the trial court erred here in refusing to read the jury the concert of action special instruction offered by plaintiffs.

[5]As pertinent here, section 876 of the Restatement Second of Torts provides: "For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he [¶] . . . [¶] (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself . . . ."

[6]Illustration 6 to clause (b) of section 876 given by the Restatement Second reporter appears to rely on the facts of *Summers v. Tice, supra*, 33 Cal.2d 80, as illustrative of the clause's operation: "6. A and B are members of a hunting party. Each of them in the presence of the other shoots across a public road at an animal, which is negligent toward persons on the road. A hits the animal. B's bullet strikes C, a traveler on the road. A is subject to liability to C." (Rest.2d Torts, § 876, com. d, illus. 6, p. 318.)

[7]But compare *Hymowitz v. Eli Lilly & Co.* (1989) 73 N.Y.2d 487 [541 N.Y.S.2d 941, 539 N.E.2d 1069] (holding defendant DES manufacturer liable for plaintiff's injuries on the basis of market share, regardless of whether it could establish its product did *not* cause the harm to plaintiff); *Hall v. Du Pont de Nemours & Co., Inc.* (E.D.N.Y. 1972) 345 F.Supp. 353 (holding all American makers of dynamite blasting caps—a total of six defendants—could be held collectively liable in tort to the plaintiff on a concert of action or "industry-wide" theory of tort liability).

Our conclusion that a concert of action jury instruction would have been inappropriate in this case is fortified by an opinion from the federal Court of Appeals for the Third Circuit, declining to apply—on First Amendment associational grounds—concert of action principles of tort liability in circumstances analogous to those presented by this record. In *In re Asbestos School Litigation* (3d Cir. 1994) 46 F.3d 1284, the panel confronted damage claims by multiple school districts filed against asbestos manufacturers in a nationwide class action. Among other theories of relief, the plaintiffs contended one of the defendant asbestos manufacturers—Pfizer, Inc.—had joined with other asbestos manufacturers to finance and conduct an industry trade group, the Safe Buildings Alliance, which assertedly was little more than a conspiracy to disseminate false information about asbestos hazards to the public and Congress. (*Id.* at pp. 1286-1288.) After the district court denied Pfizer's motion for partial summary judgment on plaintiffs' conspiracy and concert of action claims, it sought interlocutory relief.

The Third Circuit granted a writ of mandamus vacating the trial court's ruling. (*In re Asbestos School Litigation, supra,* 46 F.3d 1284 at pp. 1295-1296.) Relying on *NAACP v. Claiborne Hardware Co.* (1982) 458 U.S. 886 [102 S.Ct. 3409, 73 L.Ed.2d 1215] (*Claiborne*), the court held Pfizer's participation in the manufacturers' trade association was constitutionally protected against plaintiffs' conspiracy and concert of action claims. ■ Mere association without more, the court held, cannot support conspiracy liability in tort. Instead, the *Claiborne* case imposes a heightened burden of proof before civil liability may be imposed for such associational conduct. As the *Claiborne* court had written, "[c]ivil liability may not be imposed merely because an individual belonged to a group, some members of which committed [tortious] acts." (*Claiborne, supra,* 458 U.S. at p. 920 [102 S.Ct. at p. 3429].) For "[t]o impose liability without a finding that the [defendant] authorized—either actually or apparently—or ratified unlawful conduct would impermissibly burden the rights of political association that are protected by the First Amendment." (*Id.* at p. 931 [102 S.Ct. at p. 3435].) It is necessary, the court held, to show that " 'the group itself possessed unlawful goals and that the individual held a specific intent to further those illegal aims.' " (*In re Asbestos School Litigation, supra,* 46 F.3d at p. 1289, quoting *Claiborne, supra,* 458 U.S. at p. 920 [102 S.Ct. at p. 3429], italics omitted.)

■ We are skeptical that the record here satisfies such an exacting constitutional standard, requiring as it would evidence that Gatke, a minor player contributing about $250 a year to the Saranac Laboratory research investigations, possessed the specific intent to promote the sale of asbestos products made by its competitors. The testimony that was produced at trial

tended to show that Gatke sought access to the Saranac Laboratory report in order to assist its defense of workers compensation claims filed against it in Massachusetts. Like the Third Circuit in *In re Asbestos School Litigation,* *supra,* 46 F.3d 1284, we too are concerned that requiring a manufacturer "to stand trial for civil conspiracy and concert of action predicated solely on its exercise of its First Amendment freedoms could generally chill the exercise of the freedom of association by those who wish to contribute to, attend the meetings of, and otherwise associate with trade groups and other organizations that engage in public advocacy and debate." (*Id.* at pp. 1295-1296.)

CONCLUSION

The judgment of the superior court is affirmed.

Kay, P. J., and Rivera, J., concurred.

On April 25, 2003, the opinion was modified to read as printed above. Appellants' petition for review by the Supreme Court was denied June 11, 2003.